**TRAVELERS INDEMNITY COMPANY**

v.

**Marianne CENTLIVRE, et al.**

**TRAVELERS INDEMNITY COMPANY**

v.

**ARTEMIDE, INC., et al.**

**Civ. A. Nos. 92–0467, 92–0469.**

United States District Court,
E.D. Pennsylvania.

Oct. 22, 1993.

Craig Russell Blackman, Jane Landes Foster, Stradley Ronon Stevens & Young, Philadelphia, PA, for plaintiff.

Richard Max Bockol, Bala Cynwyd, PA, John Francis Triggs, Kristine Marie Reddington, Jacobson & Triggs, New York City, Russell D. Henkin, Berger & Montague, P.C., Philadelphia, PA, Lance C. Martin, Beigel & Sandler, Chicago, IL, for defendants.

George W. Croner, Kohn, Savett, Klein & Graf, P.C., Philadelphia, PA, for movant.

### MEMORANDUM

GILES, District Judge.

Travelers Indemnity Company ("Travelers") has brought suit to enforce indemnification agreements by which defendants agreed to reimburse Travelers for monies required to be paid by it on their behalf when defendants defaulted on their loan obligations. Defendants have refused to honor their indemnification agreements, asserting that but for Travelers' fraud they would never have entered into the underlying investment arrangements of which the Travelers indemnity agreements were a part. Defendants have also asserted various other affirmative defenses, and have filed counterclaims asserting violations of federal securities laws, and RICO and state fiduciary laws.

The court has jurisdiction by reason of diversity of citizenship. Under the terms of the Travelers' indemnity agreement, the parties agreed that Pennsylvania law would apply in all respects to its interpretation and application.

Travelers has moved for summary judgment claiming that judgment should be entered in its favor as a matter of law for a number of reasons, chief among them being that the indemnity agreements are valid and enforceable and that defendants, though asserting the existence of fraud by Travelers, have failed to demonstrate fraud or any other illegality by their surety relative to their own investment decisions. We agree and, for the reasons set forth below, judgment will be entered in favor of Travelers and against defendants on all causes of action asserted between the parties.

## I. FACTUAL BACKGROUND

The undisputed facts follow. In 1985 and 1986, National Property Analysts, Inc. ("NPA") a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania, sponsored and syndicated a series of real estate limited partnerships known as National Community Centers, Inc. (hereinafter identified as "NCC" followed by a roman numeral). Each of these limited partnership offerings was described in a private placement memorandum ("PPM"). These consolidated lawsuits concern the NCC XI-A (*Travelers v. Centlivre*) and NCC XII (*Travelers v. Artemide*) partnerships. An investor became a limited partner in the partnership in which the investment was made by purchasing a unit or portion of a unit in the partnership. Investors could fund their investments in several different ways, should they elect not to, or were unable to, purchase outright. They could obtain financing for the investment independently or could choose, if qualified, a financing option from the PPM. The two PPM financing options presented to the defendants required the investors to sign a Promissory Note and required that the Notes be bonded by Travelers so that they could be assigned to a lender in exchange for funds to the partnership. Travelers agreed to bond the Note obligations provided the investor defendants agreed to indemnify Travelers should it have to pay the Note obligations upon their default, reimburse Travelers for all related attorneys' fees and expenses and resolve any disputes with Travelers in the Pennsylvania courts.

According to the terms of the Notes, each defendant was obligated to make quarterly

payments of principal and interest, or interest alone, for a number of years, with a large balloon payment of $52,500 per unit coming due in November of 1991 for NCC XI–A and a balloon payment of $107,000 per unit coming due in December of 1991 for NCC XII. All of the defendants failed to pay their balloon payments as obligated, and certain of them also failed to make earlier payments.

Defendants admit that they signed the Notes and executed the Indemnification Agreements. They also admit that they have not made certain payments required under the Notes. *See*, NCC XI–A Answer ¶¶ 37, 41; NCC XII Answer ¶¶ 34, 38. After their respective defaults, LaSalle National Bank, as trustee to Credit Lyonnais, then the holder of the Notes and Bonds, advised Travelers of defendants' defaults under the Notes and made demand on Travelers to make the payments which defendants failed to make, plus interest. As required under the Bond, Travelers paid on behalf of each of the defendants.[1]

Despite demand by the Travelers, the defendants have failed and continue to refuse to indemnify Travelers under the Indemnification Agreements for the payments Travelers made on their behalf. Travelers brought two suits which have been consolidated by this court for joint determination.

## II. DISCUSSION

The Indemnification Agreements provide: [t]he investor will pay to the surety upon demand, at any time and from time to time: (i) all amounts paid by the surety under the Bond, together with interest thereon from the date of such payment by the surety at the rate of 12% per annum ...; (ii) all costs and expenses (including attorney's fees and legal expenses) incurred by the surety in connection with any such payment under the Bond; and (iii) all costs and expenses (including reasonable attorney's fees and legal expenses)

incurred by the surety in connection with the exercise or enforcement of any of the rights of the surety hereunder or the failure by the investor to perform any of his obligations hereunder.

*Id.*

Defendant's only defense to non-payment is the assertion that Travelers somehow engaged in fraud attributed to the sponsor NPA and its agents, and, therefore, the indemnification agreements are void *ab initio*. However, defendants do not claim that there were any misrepresentations or omissions in the indemnification agreements on the bonds. The indemnification agreements are not ambiguous and are enforceable as a matter of contract law unless the defendants can show fraud by Travelers upon which they relied in undertaking their investments.

■ Travelers, having moved for summary judgment has the burden at this stage of proceedings of demonstrating that there is no reasonable evidence to support the non-moving party's case, taking the evidence in the light most favorable to the defendant and all reasonable inferences derived therefrom. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). Upon Travelers advancing proof of the absence of fraud, the non-movant bears the burden of producing some contradictory evidence in order to survive the summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–51, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

■ Defendants allege that Travelers worked with the sellers of the limited partnership interests in structuring the NCC XI–A and NCC XII partnership transactions and that Travelers reviewed, commented on and contributed to the NCC XI–A and NCC XII private placement memoranda. NCC XI–A Answer and Counterclaims ¶¶ 116–118; NCC XII Answer and Counterclaims ¶¶ 120–122. These allegations, even if true, do nothing more than aver that Travelers made an in-

---

1. Travelers has documented the payments that it has made on behalf of each individual defendant and the expenses it has incurred as a result of their defaults and refusals to indemnify. Travelers paid nearly $5,082,453.93 on its NCC XI–A and NCC XII bonds for these defendants alone.

Travelers has paid a total of $21,150,750.00 on account of all of the defaulting investors in all of the NCC partnerships. Affidavit of Peters Exhibit "D" (The amounts are set forth in the schedule attached to the Peters Affidavit as "D–3").

vestigation of its own to determine whether it would accept the bonding risks associated with the indemnification agreements. Defendants have not alleged that Travelers' activities related to any particular portion of the private placement memorandum, or anything that allegedly contained misrepresentations or omissions. Travelers has submitted the Affidavits of F. Morten Muller ("Muller Affidavit") and William Thomas ("Thomas Affidavit"), attached to Travelers' Motion as Exhibits "E" and "F" respectively, stating that Travelers read and analyzed portions of the private placement memoranda in connection with its own evaluation of the partnerships; that it discussed the partnership transactions with representatives of NPA to the extent necessary for its own evaluation; that it did not contribute to the PPMs; that it did not participate in structuring the partnership transactions, and that the Indemnification Agreement and Bond were Travelers documents. *Id.*

Defendants also complain that Travelers investigated the economic and financial merits of the partnership transactions and expressed interest in the financial viability of the partnerships. NCC XI–A Answer and Counterclaims ¶¶ 119–124; NCC XII Answer and Counterclaims ¶¶ 123–128. The allegations then conclude, without factual averment, that Travelers knew or should have known that the financial projections contained in the private placement memoranda were unreasonable and so deceptive and misleading as to be false. There is no allegation as to what information Travelers had that would have caused it to know this. The defendants merely allege that Travelers knew or should have known. These allegations amount to no more than an assertion that there was a misevaluation of the project by Travelers. They do not show that Travelers undertook a duty to defendants. Representatives of Travelers who were involved in the bonding of NCC limited partner investors deny knowledge of any alleged misrepresentation, omission or fraud or knowledge of any information that caused them to suspect any misrepresentation, omission or fraud. *See,* Affidavits of Muller and Thomas. Indeed, it is undisputed that Travelers relied on the information in the PPMs and it stands

to reason that it would not have agreed to bond the partnerships if it had believed the transactions were economically unreasonable or that there was anything fraudulent about these transactions which could only operate to its considerable detriment. *See* Thomas Affidavit ¶ 6. Defendants are not able to answer the simple question of why Travelers would knowingly bond investors in a project which it knew to be fraudulent.

█ Finally, the fourth group of factual allegations against Travelers relate to what are referred to as the NPA guarantees, an alleged undisclosed indemnity agreement between Travelers and NPA in connection with the bonding of certain investors. *See* NCC XI–A Answer and Counterclaims ¶¶ 125–145; NC XII Answer and Counterclaims ¶¶ 129–149. There were no NPA guarantees for any investor in NCC XI–A. Therefore, those allegations are not applicable to the *Centlivre* case. There were five NPA guarantees of investors in NCC XII in connection with four and one-fourth units in NCC XII.

The Thomas Affidavit presents undisputed evidence that when Travelers agreed to bond investors in NCC XII, it had credit standards by which it evaluated whether or not to bond a particular investor. Purchaser questionnaires answered by investors provided financial information to Travelers. In some instances, Travelers requested supplemental information and it obtained credit reports on investors before deciding whether to bond any particular investor. If a bond was to be issued, it had to be done at the time of the loan closing between the partnership and Credit Lyonnais, the lending bank.

As to several investors in NCC XII, Travelers was either not able to satisfy itself that the investor was strong enough financially to warrant bonding, or additional information required by Travelers had not been received immediately before the closing. In these cases, NPA, the sponsor of the partnership, agreed to provide Travelers with an indemnification so that if the investor defaulted on his note obligations, Travelers could look not only to the investor, but also to NPA for repayment. This additional indemnity brought the risk associated with bonding the

particular investor to a level acceptable to Travelers, and therefore, Travelers agreed to bond those investors. Where Travelers anticipated additional documentation, the NPA indemnity was released when Travelers received the documentation. These indemnity agreements were given by NPA, not by the partnership or by the general partner. These NPA guarantees were given at the loan closing and well after the partnership closing. These NPA guarantees did not exist and the need for them could not have been known at the time the NCC XII private placement memorandum was distributed, at the time the investors made their investments or at the time the NCC XII partnership closed. There is no dispute as to the fact of these NPA guarantees.

Defendants argue that these NPA guarantees reduced the risk for which Travelers had bargained, and that the NPA guarantees exposed the partnerships and the limited partners to possible detrimental consequences.

Defendants further argue that the anticipated consequence of bonding investors who were not prime financial candidates was that they would default, jeopardizing the financial success of the investment vehicle. This argument is unreasonable and untenable. If an investor defaulted, Travelers, not the partnership or the project, had to pay. Simply because in those five instances, Travelers demanded indemnity agreements from the sponsor as a condition of bonding investors did no more than give Travelers additional security beyond its looking to the defaulting individual investor. Again, the sponsor NPA, and not the partnership or a general partner, gave the indemnity agreements.

If neither the investor nor NPA repaid Travelers, Travelers would be entitled to foreclose on the limited partner's partnership unit, but not on the partnership and not on the partnership property. *See,* NCC XI–A at 10–11; NCC XII at 10–12; Indemnification Agreement ¶¶ 1, 2, 6, 7. A foreclosure by Travelers on a partnership unit would have no effect on the partnership or on the other limited partners.

The purpose of bonding in the partnership transaction was to guarantee payment of the Notes so that the Notes would be purchased by a bank and the partnership would receive cash up front. The risk of non-payment of the Notes was thus assumed by the bonding company. So long as the investors' investments were bonded, the partnership was protected whether the individual investor happened to be financially sound or not, whether there was a default or not, and without regard to whether Travelers had selected to reduce its risk by obtaining indemnity from a third party.

Defendants defend against the Travelers' indemnification alleging that the Indemnification Agreement was part of a package of documents and that it is therefore unenforceable because of a fraud in other contracts of which it is a part, that the defendants were fraudulently induced to invest in the partnership, that Travelers' complaint fails to state a cause of action, that pursuant to the law of suretyship, they are entitled to assert against Travelers the defenses they have against the Note, and that because of the five NPA guarantees, Travelers got a fee for writing bonds without risk and therefore the Indemnification Agreements are void and unenforceable for lack of consideration. All of these defenses are without merit.

Travelers has by affidavit averred that it did not know of any fraud and defendants have neither identified the fraud in underlying documents nor alleged facts by affidavit or otherwise showing that Travelers actually knew of any fraud. For these reasons, the defenses are dismissed. Additionally, defendants have failed to allege, and have failed to prove in response to the summary judgment motion, that Travelers, their surety for an investment risk that they chose to accept, had any duty to them to investigate for them the financial projections of the partnership and to advise investors whether to invest or not. It is well settled law that a surety owes no duty to investors to disclose information to investors. *National Union Fire Ins. Co. v. Turtur,* 892 F.2d 199 (2d Cir.1989); *see also Antinoph v. Laverell Reynolds Securities,* 703 F.Supp. 1185 (E.D.Pa.1989); *Cairns v. Renneisen,* No. 85–2827, 1987 WL 15427 (E.D.Pa. August 6, 1987). Furthermore, in paragraph 13 of the Investor Bond Agreement, defendants ac-

knowledged that the "Surety had not reviewed the merits of the Partnership's Investment or proposed investments and make no recommendations of any kind whatsoever with respect thereto." Defendants, then, were not only on actual notice but agreed in writing as sophisticated investors that they were not relying upon Travelers in any way for their investment decisions or evaluations of the financial projections.

█ Defendants next argue that non-disclosure of the five NPA guarantees for NCC XII was fraudulent, and that Travelers knew these guarantees were not disclosed in the PPM. It is undisputed that these guarantees came into existence substantially after the defendant investors had made their investments. Therefore, they could not have been disclosed and their subsequent existence is totally irrelevant to the prior investment decisions. Even fraudulent activity occurring after the purchase cannot form the basis for a securities fraud claim. *See, Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms, Inc.,* 73 F.R.D. 420, 425 (E.D.Pa.1977), *aff'd without opinion,* 586 F.2d 834 (3d Cir.1978).

Defendants further argue that Travelers' failure to disclose the five NPA guarantees when they came into existence perpetuated and assisted the fraud of the general partner because Travelers had to have known that if the investors who were not creditworthy were being accepted, the financial projections for the investment vehicle must have been so speculative as to have been fraudulently made. This argument is equally meritless and illogical as the foregoing proposition which was dismissed. An investor became qualified once there was bonding. Travelers bonded. That is all that the other investors had the right to require. Therein lay their protection. The partnership did not rely upon, and no investor relied upon, the individual creditworthiness of investors. They relied upon the bonding commitment and performance of Travelers. It is that that they received and cannot now be heard to complain. That NPA gave guarantees such that it, as sponsor, conceivably might become the owner of 4½ units did not have to be disclosed. The investors understood and agreed through the NCC XII PPM that NDA could purchase outright as many as 12 units in order to close the deal. Nevertheless, defendants defiantly argue without factual foundation that the five indemnity agreements between Travelers and NPA reduced the financial viability of the investment vehicle. However defiantly stated, it defies reason for defendants in NCC XII to argue that NPA was more financially exposed by guaranteeing 5 investors' investments in 4½ units than by purchasing 12 units outright.

An appropriate Order follows.[2]

### ORDER

AND NOW, this 22nd day of October, 1993, upon consideration of plaintiff's motions for summary judgment in the above-captioned cases, and defendants' responses thereto, it is hereby ORDERED that:

1. Plaintiff's motions for summary judgment are GRANTED as to all counts of the complaints in both of the above-captioned cases.

2. Plaintiff shall submit, within ten (10) days of this Order, a form of final judgment.

---

**2.** In addition to the claims regarding the NCC XI–A and NCC XII partnerships, Count IV of the amended complaint in *Travelers v. Artemide, et al.,* No. 92–0469, also states claims against defendant Shirlee Haber which are not discussed in the body of this Memorandum. Travelers has also moved for summary judgment on Count IV. *See* Travelers' Motion for Summary Judgment on Count IV (docketed at #46); Shirlee Haber's Reply to Plaintiff's Motion on Count IV (docketed at #53); Travelers' Response in Support of Motion for Summary Judgment on Count IV (docketed at #55). Travelers' Motion for Summary Judgment on Count IV is granted as unopposed by affidavit and for the reasons stated in Travelers' briefs.